**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Esther Valencia Martinez, Individually and on behalf of the children of Jesse Martinez, deceased,<br><br>        Plaintiff,<br><br>vs.<br><br>Terex Corporation, et al.<br><br>        Defendants. | No. CV 05-1166-PHX-MHM<br><br>**ORDER** |

Currently before the Court is Defendants Terex Corporation and CMI Terex Corporation's ("Defendants") Motion to Strike the Testimony of Plaintiff's Expert, Carl Finocchiaro, and Request for Rule 104(A) Hearing (Dkt.#53) and Defendants' Motion for Summary Judgment. (Dkt.#57).[1]  After reviewing the pleadings and conducting oral argument on February 15, 2007, the Court issues the following Order.

**I.        Factual Background**

On December 16, 2004, Plaintiff Esther V. Martinez ("Plaintiff"), individually and on behalf of the children of Jesse Martinez, filed the instant products liability action in the Superior Court of Maricopa County, Arizona.  On April 18, 2005, Defendants, both

---

[1]Defendants should take note that the font presented in much of their briefing to the Court does not comply with LRCiv 7.1(b), which requires 13 point font.

corporations located outside the state of Arizona, removed this action to this Court. (Dkt.#1). Plaintiff's claims of liability derive out of an accident occurring on January 15, 2004, resulting in the death of Plaintiff's husband, Jesse Martinez. (DSOF ¶ 7). Mr. Martinez was working as an employee of Ameron International ("Ameron"), which operates a cement manufacturing facility and fabrication facility in Phoenix, Arizona. Mr. Martinez was an employee of Ameron since 1998 and operated the cement mixer at the Ameron plant since 2001. (DSOF ¶ 12). At the time of the accident, although not directly witnessed by anyone, Mr. Martinez was near the operating cement mixer when he was somehow caught in between the guard rail and the cement mixer and he was pulled under the cement mixer, trapping him. After a period of attempting to remove Mr. Martinez, he passed away due to blunt force trauma and positional asphyxiation. (PSOF ¶13). Plaintiff's theory of liability against the Defendants is based upon products liability. Plaintiff asserts in her Complaint that the subject cement mixer "designed, manufactured, assembled, marketed, distributed, and sold by Defendants was defective and unreasonably dangerous..." (Dkt.#1, Complaint ¶ 5). The cement mixer at issue, Model 430, was sold to Ameron in April of 2001, by Defendant CMI Terex Corporation's predecessor in interest. (DSOF ¶1). At the time of the sale, certain warning labels accompanied the cement mixer at issue, including addressing the danger of wearing loose clothing in and around the cement mixer, and the possibility of serious injury or death resulting from the failure to heed such warnings. (DSOF ¶4). In addition, the manual accompanying the sale of the cement mixer expressly stated to "NEVER ATTEMPT TO CLEAN, OIL OR ADJUST ANY MACHINE WHILE IT IS IN MOTION." (Id.) (Emphasis original). The operating manual of the cement mixer also instructed that when performing maintenance, the user should shut down the machine, remove the operating key, lock the machine ("lock-out") and tag the machine warning against operation ("tag-out"). (Id.).

It is disputed between the parties as to whether Mr. Martinez was attempting to clean the cement mixer during its operation at the time of the accident. (DSOF ¶9; PSOF ¶8). Shortly before the accident Mr. Martinez's co-worker, Mr. Jose Urias-Castro, observed Mr. Martinez

1   on the platform next to the cement mixer spraying a cleaning agent into the operating cement

2   mixer.   (PSOF ¶7).  Mr. Castro testified that Mr. Martinez routinely cleaned the cement

3   mixture while it was running and typically wore a jump suit or jacket while doing so.  (DSOF

4   ¶9).  As a result of the accident, an investigation was performed by the Arizona division of

5   the Occupational Safety and Health Administration. ("OSHA").  The investigation yielded

6   several violations against Ameron, including the failure to provide a safe work place and

7   failure to adequately instruct and train its employees.  The investigation also noted that Mr.

8   Martinez was not provided a copy of the cement mixer's operating manual. (DSOF ¶¶12-13).

9   **II.        Standard**

10      A motion for summary judgment may be granted only if the evidence shows "that there

11  is no genuine issue as to any material fact and that the moving party is entitled to judgment

12  as a matter of law." Fed.R.Civ.P. 56(c).  To defeat the motion, the non-moving party must

13  show that there are genuine factual issues "that properly can be resolved only be a finder of

14  fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty

15  Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  The party opposing summary

16  judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but

17  ... must set forth specific facts showing that there is a genuine issue for trial."  Rule 56(e).

18  See Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 586-87 106 S.Ct. 1348

19  (1986).  The evidence must be viewed in the light most favorable to the nonmoving party.

20  Devereaux v. Abbey, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc).

21  **III.       Arizona Products Liability Law**

22      In order to establish a prima facie case of strict products liability, "the plaintiff must show

23  that the product was in a defective condition that made it unreasonably dangerous, the

24  defective condition existed when the product left the defendant's control, and the defective

25  condition proximately caused the plaintiff's injuries.  State Farm Ins. Co. v. Premier

26  Manufactured Systems, Inc., 213 Ariz. 419, ¶26, 142 P.3d 1232, 1239 (Ariz. App. 2006)

27  (citation omitted).  Three types of defects can result in an unreasonably dangerous product:

28  (1) design defects, (2) manufacturing defects, and (3) informational defects encompassing

1   instructions and warnings.  Brown v. Sears, Roebuck & Co., 136 Ariz. 556, 562, 667 P.2d

2   750, 756 (Ariz.App. 1983).  With respect to causation, to establish fault, "a plaintiff must

3   prove that the defendant's negligence proximately caused the plaintiff's injury."  Stephens v.

4   Bashas', Inc., 186 Ariz. 427, 431, 924 P.2d 117, 121 (Ariz.App. 1996).  The proximate cause

5   of an injury is defined in Arizona as "that which, in a natural and continuous sequence,

6   unbroken by any efficient intervening cause, produces an injury, and without which the

7   injury would not have occurred."  Robertson v. Sixpence Inns of Am., Inc., 163 Ariz. 539,

8   546, 789 P.2d 1040, 1047 (1990).

9   **IV.       Expert Testimony of Carl Finocchiaro**

10      In asserting her product liability theory against Defendants, Plaintiff offers the expert

11  report and testimony of Mr. Carl Finocchiaro ("Mr. Finocchiaro").  Mr. Finocchiaro has a

12  masters degree in engineering management and a bachelors of science in aerospace

13  engineering.   His curriculum vitae indicates expertise in product liability issues including

14  design defects, guarding, warning and instructions.  (Plaintiff's Response, Dkt.#61, Exhibit

15  5).  Mr. Finocchiaro has authored four publications entitled: (1) Automotive Airbags; (2)

16  Evidence Handling and Preservation of Evidence in Suspected Arson Cases; (3) Occupant

17  Kinematics and Biomechanical Injury Evaluation in Recreational Rides; and (4) Vehicle

18  Fires: Fire Dynamics and Investigation Methods. (Id.).  On January 13, 2006, during the

19  course of this litigation, after being retained by Plaintiff's counsel, Mr. Finocchiaro authored

20  a report concluding in pertinent part:

21      (1)      the power delivered to the mixer drum (80 horsepower) constituted a
22               considerable potential hazard and therefore warranted an extensive guarding
             system to prevent contact with moving parts.  Such was not provided.

23      (2)      The barrier guards that were supplied with the mixer were in violation of safe
24               engineering practices standards since they failed to prevent a body part from
             coming into contact with a hazardous location, and in addition, they also
25               created a nip point hazard.  Therefore, the design of the mixer was defective
             and unreasonably dangerous due to its inadequate guarding system.

26      (3)      The defective mixer caused and/or contributed to the subject accident.
    (Plaintiff's Response, Dkt.#61, Exhibit 8).

27

28

These conclusions were based upon a review of several materials including: (1) standards published by American National Standards Institute (ANSI) and American Society for Mechanical Engineers (ASME); (2) OSHA regulations; (3) Industrial Commission of Arizona's investigate report; (4) Defendants' Owners Manual for the concrete mixer; (5) Defendants' expert disclosure statement, including the reports of Jerry Purswell, Ph.D, P.E. ("Dr. Purswell"), and Jay R. Taylor ("Mr. Taylor"); (5) Engineering drawings of the cement mixer; (6) the Complaint; and (7) Certificate of Death and Autopsy.   (Id. Exhibit 5).  Mr. Finocchiaro also personally inspected the cement mixer at issue in this case.  On April 13, 2006, Mr. Finocchiaro was deposed by Defendants' counsel regarding his opinions and the bases in support thereof.  Based upon Mr. Finocchiaro's background, experience, and methodology associated with his findings, Defendants move to strike his testimony on several grounds including that  the proposed testimony does not meet the standards of admissibility of expert testimony as provided in the Federal Rules of Evidence.   In conjunction with Defendants' Motion to strike, the Defendants also move for summary judgment on Plaintiff's claims on the basis that Plaintiff cannot establish the requisite elements of her claims.

**V.        Motion to Strike/Exclude Expert Testimony of Mr. Finocchiaro**

Defendants contend that it is appropriate to strike Mr. Finocchiaro's expert testimony because it fails both the reliability and relevance prongs of Rule 702 of the Federal Rules of Evidence.  Defendants further contend it is appropriate to strike pursuant to Rules 703 and 403 of the Federal Rules of Evidence as well.

Rule 702 Fed.R.Evid. provides in pertinent part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The plaintiff bears the burden in establishing the pertinent admissibility requirements are met by a preponderance of the evidence.  See Bourjaily v. United States, 483 U.S. 171, 175

1   (1987).  It is the trial court's obligation to act as a "gatekeeper" to admission of expert

2   scientific testimony under Rule 702.  Daubert v. Merrell Dow Pharms., Inc., 509 .S. 579, 597

3   (1993).  In performing its "gatekeeper" role, the trial court is not obligated to conduct a

4   separate evidentiary hearing on the admissibility of the proffered expert testimony. See

5   United States v. Alatorre, 222 F.3d 1098, 1102 (9th Cir. 2002).  The first prong of the Daubert

6   analysis requires the trial court to evaluate evidentiary reliability, or trustworthiness.  See

7   Daubert, 509 U.S. at 590 n.9.  The Supreme Court has articulated four non-exclusive factors

8   to consider: (1) whether the scientific theory or technique can be (and has been) tested; (2)

9   whether the theory or technique has been subjected to peer review and publication; (3)

10  whether a particular technique has a known potential rate of error; and (4) whether the theory

11  or technique is generally accepted in the relevant scientific community.  Id. at 593-94.   In

12  addition, the Ninth Circuit Court of Appeals has noted that a "very significant fact to be

13  considered is whether the experts are proposing to testify about matters growing naturally

14  and directly out of research they have conducted independent of the litigation, or whether

15  they have developed their opinions expressly for purposes for testifying." Daubert v. Merrell

16  Dow Pharms., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995 ("Daubert II").  If the evidence is not

17  based upon independent research, this Court must determine whether there exists any "other

18  objective, verifiable evidence that the testimony is based on 'scientifically valid principles'"

19  Id. at 1317-18.  Generally, peer review meets this requirement yet it may also be met by:

20   precisely [explaining] how [the experts] went about reaching their conclusions and
     point[ing] to some objective source - a learned treatise, the policy statement of a
21   professional association, a published article in a reputable scientific journal or the like-
     to show that they have followed the scientific method, as it practiced by (at least) a
22   recognized minority or scientists in their field.
     Id. at 1319 (citing United States v. Rincon, 28 F.3d 921, 924 (9th Cir. 1994).

23  The Supreme Court noted in Kumho Tire, that "the test of reliability is 'flexible,' and

24  Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or

25  in every case. Rather, the law grants a district court the same broad latitude when it decides

26  how to determine reliability as it enjoys in respect to its ultimate reliability determination."

27  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141-42 (1999).

28

1    Rule 702's second prong concerns relevancy, or "fit." See Daubert, 509 U.S. at 591.  The

2    trial court "must ensure that the proposed expert testimony is 'relevant to the task at hand,'

3    ... i.e., that it logically advances a material aspect of the proposing party's case." Daubert II,

4    43 F.3d at 1315. "[T]he standard for fit is higher than bare relevance." In re Paoli R.R. Yard

5    PCB Litig., 35 F.3d 717, 745 (3d Cir. 1994).

6    Finally, even under Daubert, this Court must still weigh the balancing factors of

7    Fed.R.Evid. 403.  Specifically, Rule 403, permits the exclusion of relevant evidence "if its

8    probative value is substantially outweighed by the danger of unfair prejudice, confusion of

9    the issues, or misleading the jury..." Daubert, 509 U.S. at 595.

10   **A.      Reliability**

11   In evaluating the reliability of Mr. Finocchiaro's findings it is important to first evaluate

12   the matters that he intends to address with this expert analysis.  In Plaintiff's response, to

13   Defendants' Motion to Strike, the Plaintiff articulates four areas that Mr. Finocchiaro intends

14   to address. First, Plaintiff states that Mr. Finocchiaro intends to testify regarding "the design

15   and configuration of the Model 430 cement mixer manufactured and sold by Defendants

16   "including certain aspects relating to the accident such as "how and why [the] metal guards

17   collapsed in the subject accident allowing Mr. Martinez to be drawn into the machinery."

18   (Plaintiff's Response, Dkt.#61, pp.5-6).  Second, Mr. Finocchiaro intends to provide his

19   expert testimony regarding the safety hierarchy used in the field of engineering.  Plaintiff

20   relates that "Mr. Finocchiaro will tell the jury about this safety hierarchy and explain how

21   Defendants failed to meet the requirements of the safety hierarchy in connection with the

22   failure to provide guard (sic) against the hazards presented by the mixer and by failing to

23   provide warnings and instructions about the hazards, specifically, the need to incorporate

24   additional guards to protect workers in close proximity to the mixer." (Id. p.7).  Third,

25   Plaintiff discloses that Mr. Finocchiaro will offer his opinion that the cement mixer "as

26   manufactured and sold by Defendants, was defective and unreasonably dangerous as a result

27   of its design and inadequate warnings and instructions."  (Id. p.7-8).  Fourth, and lastly,

28   Plaintiff relates that Mr. Finocchiaro will testify "that it was technologically feasible to

1   design an adequate and effective guard that would have prevented the fatal accident

2   involving Jesse Martinez." (Id., p.8). The Court will review each of these identified opinions

3   to determine if they are sufficiently reliable to satisfy this Court in its gatekeeping function

4   regarding expert testimony.

5   **(1) Testimony Regarding the Overall Design of the Cement Mixer Model 430**

6   Plaintiff relates that Mr. Finocchiaro will offer his expert testimony regarding the design

7   and configuration of the Model 430 cement mixer manufactured and sold by Defendants

8   "including certain aspects relating to the accident such as "how and why [the] metal guards

9   collapsed in the subject accident allowing Mr. Martinez to be drawn into the machinery."

10   (Plaintiff's Response, Dkt.#61, pp.5-6). Plaintiff contends that the foundation supporting Mr.

11   Finocchiaro's expert testimony on this topic is grounded in his educational background, his

12   experience with equipment design, review of design drawings, technical manuals, various

13   investigations performed regarding the accident and his inspection of the cement mixer.

14   With respect to the design aspect of Mr. Finocchiaro's proposed expert testimony, the factors

15   cited by Plaintiff likely do satisfy the reliability prong of the Court's Daubert analysis. For

16   instance, Mr. Finocchiaro's education and experience in the field of engineering likely enable

17   him to offer an expert opinion regarding the design features of the Model 430 cement mixer,

18   at issue in this litigation. Mr. Finocchiaro has a bachelors degree in aerospace engineering

19   and a masters degree in engineering management. Moreover, he has been a practicing

20   engineer since 1984 working capacities ranging from structural dynamics and amusement

21   park manufacturing. (Plaintiff's Response, Dkt.#61, Exhibit 5). This education and

22   experience appears to provide Mr. Finocchiaro with the necessary background to formulate

23   and offer testimony explaining the design of the cement mixer at issue. Moreover, there

24   appears to be little dispute from the Defendants as to Mr. Finocchiaro's ability to offer

25   testimony as to the overall design of the cement mixer. For instance, Defendants note that

26   should Mr. Finocchiaro provide testimony solely to the issue of how the cement mixer

27   operates, then Defendants "would not find his testimony nearly as objectionable."

28   (Defendants' Reply, Dkt.66, p.3, n.3). Thus, as to the foundation testimony regarding the

design of the cement mixer at issue, the Court finds that Mr. Finocchiaro is sufficiently qualified to render reliable testimony to the jury of benefit.   However, with respect to Mr. Finocchiaro's proposed testimony as to the condition of the guards of the cement mixer and how or why the collapsed during the accident, the Court will address below the reliability of Mr. Finocchiaro's case specific opinions as to the existence of a defect or a cause of the accident.

### (2) Safety Hierarchy

As with Mr. Finocchiaro's foundational testimony regarding the design of the cement mixer and related explanation as to the guards of the mixer and their involvement in the accident, the Court finds that Mr. Finocchiaro is also sufficiently qualified with respect to his ability to render a reliable expert opinion as to the basic concept of the safety hierarchy used in the field of engineering: specifically that: (1) a machine be engineered to eliminate a hazard; (2) if the hazard cannot be eliminated, then to guard the hazard; and (3) if the hazard cannot be eliminated or guarded, to provide appropriate warnings.  As noted above, Mr. Finocchiaro has an educational and professional background in the field of engineering, providing him with a sufficient ability to provide expert testimony regarding the safety hierarchy.  The issue; however is more complex with Plaintiff's purported intention to elicit from Mr. Finocchiaro testimony that Defendants failed to comply with the safety hierarchy with respect to the cement mixer and provide sufficient warnings.  The Court will address Mr. Finocchiaro's qualifications and reliability on that issue directed at the cement mixer at issue below.

### (3) Defective Design and Inadequate Warnings Re: the Subject Cement Mixer

Plaintiff intends to call Mr. Finocchiaro as an expert witness to offer his opinion that the cement mixer "as manufactured and sold by Defendants, was defective and unreasonably dangerous as a result of its design and inadequate warnings and instructions." (Id. p.7-8). This testimony is significant as it is directed specifically at the subject cement mixer and the related accident.  The Defendants argue at length that Mr. Finocchiaro's testimony on these

points is not reliable and cite to several specific areas of Mr. Finocchiaro's deposition testimony to support their position that Plaintiff cannot offer any reliable testimony.  The Court will address Mr. Finocchiaro's opinions regarding the defective design and inadequate warnings product liability theories separately.

### (a) Defective Design

### (i) Testing

As noted by Defendants, and apparently conceded by omission by Plaintiff, Mr. Finocchiaro has not done any testing regarding his theory of an inadequate design and manufacture of the cement mixer at issue in this litigation; that is, the lack of a sufficient guarding system protecting against dangerous contact.  For instance, at Mr. Finocchiaro's deposition, the following exchange took place:

Q:      Okay.  Have you done any experiment related to the theories that you have asserted in this lawsuit.

A:      I've done no experiments.

Q:      Have you done any testing relating to the theories that you have asserted   in this lawsuit?

A:      No, sir.

(Defendants' Motion, Dkt.#53, Exhibit D, p.126, ll. 3-9).

In addition to Mr. Finocchiaro not performing any testing regarding his theory of an improper design of the subject cement mixer, he also did not perform any testing regarding his proposed alternative design of the "total barrier guard system" for the cement mixer.  (Id. at p.253, ll. 7-23).  In fact the first time Mr. Finocchiaro sketched a diagram of his total barrier guard system was during the deposition itself.  (Id. at p. 295, ll.1-5).  Moreover, Mr. Finocchiaro admitted that he had never designed, built, installed, fabricated or even saw a prototype of the total barrier guard  system he suggested.  (Id. pp. 202-03, ll.19-12).

In response to Defendants' reliance on the lack of any testing by Mr. Finocchiaro regarding his theory of inadequate design and an alternative total barrier guard system, the Plaintiff appears to argue that it is the Defendants that have failed to comply with the testing requirement.  For instance, Plaintiff states "[Mr. Finocchiaro] will ... offer testimony

1   concerning the complete lack of any testing by the Defendants regarding the adequacy of the

2   guards that they designed and installed on the cement mixer." (Plaintiff's Response, Dkt.#61,

3   pp.12-13).   However, the Court struggles to see how this is relevant to the Court's Daubert

4   inquiry with respect to Mr. Finocchiaro's expert opinion regarding an improper design of the

5   cement mixer at issue.   The burden is on the proponent to demonstrate that the expert opinion

6   or theory is reliable, which takes into consideration any testing that has been done of the

7   theory.   In this case, Plaintiff has provided no indication that the opinion or theory offered

8   by Mr. Finocchiaro regarding improper design of the cement mixer or a safer alternative total

9   barrier guard system has been tested.   Thus, under such circumstances, it is clear that  the

10  testing factor of the Daubert analysis cuts against a finding of reliability.

11                    **(ii) Peer Review and Publication**

12      In reviewing the deposition testimony of Mr. Finocchiaro it also appears clear that his

13  theory regarding an improper design or his alternative design of the total barrier guard system

14  has never been subject to any material peer review or publication.   For instance, Mr.

15  Finocchiaro testified that he has never written any articles or published any works regarding

16  guarding of equipment such as cement mixing drums. (Defendants' Motion, Dkt.#53, Exhibit

17  D, p.123, ll.4-7).   Moreover, the only peer review done of Mr. Finocchiaro's reports

18  submitted in this case was done in-house, through a co-worker at Mr. Finocchiaro's

19  engineering firm.   (Id. p.126, ll.7-15).   Such circumstances do not rise to the level of

20  publication or peer review contemplated in Daubert to test the soundness of the methodology

21  used in the analysis.   Daubert II, 43 F.3d at 1318 (stating "[t]hat the research is accepted for

22  publication in a reputable scientific journal after being subjected to the usual rigors of peer

23  review is a significant indication that it is taken seriously by other scientists, *i.e.*, that it meets

24  at least the minimal criteria of good science.").   Again, in opposition to the lack of any peer

25  review and publication of Mr. Finocchiaro's theories, Plaintiff concedes by omission that this

26  prong of the Daubert analysis is not satisfied. For instance, Plaintiff argues that the basis

27  supporting Mr. Finocchiaro's opinion can be found based upon the materials he reviewed and

28  his educational and professional experience.   While such factors are relevant, they certainly

1   do not override the important factor of peer review and publication identified in the <u>Daubert</u>

2   inquiry.  As such, the lack of any peer review or publication regarding Plaintiff's design

3   defect and alternative design theories cuts against the reliability of Mr. Finocchiaro's

4   opinions regarding such in this case.

5                    **(iii) Known Potential Rate of Error**

6       Similar to the two factors discussed above, there is no known rate of error regarding the

7   techniques or theories articulated by Mr. Finocchiaro regarding an improper design or the

8   proposed alternative of the total barrier guard system he disclosed at the deposition.  Mr.

9   Finocchiaro admitted as much during the deposition when asked if he knew of the rate of

10  error of his alternative theory. (Defendants' Motion, Dkt.#53, Exhibit D, pp. 256-57, ll.24-3).

11  While not dispositive, this factor also cuts against admission of Mr. Finocchiaro's expert

12  opinions regarding an improper design of the cement mixer and his alternative design.

13                   **(iv) General Acceptance Within the Scientific Community**

14      The Fourth factor of general acceptance of the theory or technique articulated by Mr.

15  Finocchiaro does not support admission of his expert testimony as to the issues of defective

16  design or an alternative design system identified by Mr. Finocchiaro.  As with the other

17  factors, there is no indication that the theory or methodology supporting Mr. Finocchiaro's

18  theories regarding the cement mixer are generally accepted, or have even been discussed for

19  that matter, within the scientific community.  Again, Plaintiff offers no material argument

20  in opposition to the lack of any acceptance of these theories other than Mr. Finocchiaro is

21  qualified to render this opinion based upon his review of relevant materials and background

22  as well as that his testimony will be helpful to the trier of fact.  However, this argument falls

23  short in providing any material rebuttal to the lack of reliability associated with the opinions

24  given that they are not generally accepted in the scientific community combined with the

25  other Daubert factors discussed above.

26                   **(v) Opinions Generated for Litigation**

27      The Ninth Circuit has made clear that a very relevant factor to be considered in the context

28  of a <u>Daubert</u> analysis is "whether the experts are proposing to testify about matters growing

1  naturally and directly out of research they have conducted independent of the litigation, or

2  whether they have developed their opinions expressly for purposes for testifying. <u>Daubert</u>

3  <u>II</u>, 43 F.3d at 1317.  In the instance case, the deposition testimony of Mr. Finocchiaro makes

4  clear that the opinions he has expressed result solely from the instant litigation and do not

5  have any independent basis.  Prior to this litigation, Mr. Finocchiaro had no specific

6  experience with respect to analyzing or evaluating concrete mixing drums or similar

7  machines.  This factor cuts against the admission of Mr. Finocchiaro's expert testimony in

8  this case regarding a design defect or a safer alternative design theory.  The reasoning

9  regarding the question governing expert witnesses who have not performed independent

10 research on the issue outside the scope of the litigation discussed in <u>Daubert II</u> in pertinent

11 part:

12    That an expert testifies based on research he has conducted independent of the litigation
      provides important, objective proof that the research comports with the dictates of good
13    science. ... For one thing, experts whose findings flow from existing research are less
      likely to have been biased toward a particular conclusion by the promise of
14    remuneration; when an expert prepares reports and findings before being hired as a
      witness, that record will limit the degree to which he can tailor his testimony to serve
15    a party's interests.  Then too, independent research carries its own indicia of reliability,
      as it is conducted, so to speak, in the usual course of business and must normally satisfy
16    a variety of standards to attract funding and institutional support.
   <u>Id.</u> at 1317.

17

18    To rebut this suggestion of unreliable expert testimony, the Plaintiff, though its expert,

19 "must explain precisely how [he] went about reaching [his] conclusions and point to some

20 objective source - a learned treatise, the policy statement of a professional association, a

21 published article in a reputable scientific journal or the like - to show that they have followed

22 the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his]

23 field." <u>Id.</u> at 1319.  In this case, the Plaintiff points to Mr. Finocchiaro's general explanation

24 of the procedures and processes of his review of the relevant materials, including the relevant

25 investigative materials, and applicable OSHA and ASME standards.  However, these

26 materials limited guidance regarding Plaintiff's opinions as to the improper design of the

27 cement mixer or a safer alternative design.  In fact, the record is absent of any learned -

28 treatise of other reliable source upon which Mr. Finocchiaro based his opinion regarding a

1    defective design theory.  Under such circumstances, Plaintiff fails to sufficiently demonstrate

2    reliability as Mr. Finocchiaro was retained as an expert in this case for purposes of this

3    litigation with little to no experience in addressing issues relating to defective cement mixers

4    or related machines and alternative designs regarding such machinery.

5            **(vi) Summary of Daubert Analysis Re: Design Defect**

6        In evaluating the relevant factors discussed above, while Mr. Finocchiaro's testimony

7    regarding general matters associated with the design of the cement mixer is reliable, there is

8    significant unreliability associated with Mr. Finocchiaro's proposed testimony addressing the

9    specific issues of a defective design or an alternative design of the subject cement mixer.

10   Plaintiff fails to satisfy any of the relevant Daubert factors on these issues, discussed above.

11   Under such circumstances, the Court, in its gatekeeper capacity will exclude such expert

12   testimony of Mr. Finocchiaro on the basis that it is unreliable and incompatible with Rule

13   702 Fed.R.Evid.  Moreover, considering the unreliability of the testimony, it would also be

14   inconsistent with Rule 403 Fed.R.Evid, to permit such evidence to be introduced to the jury

15   as its potential prejudicial effect resulting from the lack of a well-reasoned analysis

16   supporting the opinion outweighs any probative value.

17           **(b) Information Defect/Inadequate Warning**

18       The Court also finds that it is appropriate to exclude any expert opinion from Mr.

19   Finocchiaro regarding the existence of an information defect associated with the cement

20   mixer.  In Plaintiff's Response to Defendants' Motion to Strike, Plaintiff asserts that Mr.

21   Finocchiaro also plans to testify that Defendants failed to provide a sufficient warning

22   regarding the inherent dangers of the cement mixer because "there were no instructions or

23   warnings concerning the need for additional guarding in the event workers were in close

24   proximity to the equipment while it was in operation." (Plaintiff's Response, Dkt.#61, p.13).

25   However, as with Mr. Finocchiaro's design defect testimony, it is clear that any such

26   testimony also fails under the relevant factors of the Court's Daubert analysis.  For instance,

27   there is no indication in the record, that Plaintiff's theory has even been tested; been subject

28   to peer review or publication or has received general acceptance within the relevant scientific

1  community.   Moreover, it is clear that the opinion is not based upon any independent
2  research, but rather has arisen solely in the context of this litigation.   Given these
3  circumstances, the Court finds Plaintiff's proposed testimony regarding the theory of
4  inadequate warnings unreliable and insufficient to survive the Court's gatekeeping function
5  to preclude such unreliable testimony.   In addition, because of the inherent unreliability, the
6  proposed expert testimony on this point also fails scrutiny under Rule 403 Fed.R.Evid.

7       In addition to the unreliability surrounding any testimony from Mr. Finocchiaro regarding
8  an information defect, it is important to note that the expert report disclosed by Plaintiff
9  provides no indication suggesting that Mr. Finocchiaro would offer any such testimony.
10  (Plaintiff's Response, Dkt.#61, Exhibit 8).   Moreover, during Mr. Finocchiaro's deposition
11  he made clear that his opinion did not involve any information defect and in fact when asked
12  if he found anything wrong with the cement mixer's manual as a cause or contributing factor
13  to the cause of the accident, Mr. Finocchiaro responded "[n]o, I don't believe so."
14  (Defendants' Motion to Strike, Dkt.#53, Exhibit D, p.282, l.6).   However, now during the
15  briefing to the Court upon summary judgment and upon Defendants' Motion to Strike,
16  Plaintiff intends to offer Mr. Finocchiaro as an expert witness suggesting the existence of a
17  design defect.   To permit such would be in direct contravention of Rule 26(a)(2)(B) which
18  requires that the expert report disclose "all opinions to be expressed [by the expert] and the
19  basis and reasons therefor;..."   Rule 37(c)(1) directs that when such an opinion is not
20  disclosed, unless harmless, the party is not permitted to use such evidence at trial or upon a
21  motion.   The Court finds these Rules instructive in precluding any such testimony by Mr.
22  Finocchiaro.

23       **B.       Relevance**

24       Because of the Court's finding regarding the inherent unreliability associated with
25  Plaintiff's proposed expert testimony of a design or information defect, the Court will not
26  reach the merits of the relevance of the proposed expert testimony regarding improper design
27  and inadequate warnings.

28

1    **VI.        Significance of Striking Plaintiff's Expert Re: Summary Judgment**

2        In light of the Court's determination to strike Mr. Finocchiaro's expert testimony regarding

3    the existence of a design or information defect, the Court must evaluate the merits of

4    Plaintiff's claims without such testimony.  Clearly, the striking of Mr. Finocchiaro as to these

5    issues is significant as he is the only expert witness identified by Plaintiff to address such

6    theories.   In certain situations, this fact alone, is sufficient to the granting of summary

7    judgment. See Cabrera v. Cordis Corp., 134 F.3d 1418, 1423 (9th Cir. 1998) (affirming

8    district court's exclusion of plaintiff's experts in products liability involving brain shunt

9    design, finding that without the experts, plaintiff could not prove causation or liability );

10   Cloud v. Pfiezer, Inc., 198 F. Supp.2d 1118, 1138-39 (D.Ariz. 2001) (excluding plaintiff's

11   expert witness in products liability action involving antidepressant medication, finding that

12   without such testimony, plaintiff could not prove causation).  However, in light of the Parties'

13   supplemental briefing, it is apparent that there is no requirement under Arizona law that

14   expert testimony be given in a products liability action.  See Dietz v. Waller, 141 Ariz. 107,

15   110, 685 P.2d 744,747 (Ariz. 1984) ("[p]laintiffs ... must be permitted to rely upon

16   circumstantial evidence alone in strict liability cases...") (citation omitted).  As such, the issue

17   before the Court is whether Plaintiff's design or information defects theories survive

18   summary judgment without the assistance of any expert testimony.

19       **A.        Defective Design**

20       With respect to Plaintiff's defective design theory regarding the subject cement mixer,

21   Plaintiff has the burden to demonstrate that the cement mixer was in a defective condition

22   that made it unreasonably dangerous, the defective condition existed when the cement mixer

23   left the Defendant's control, and the defective condition  proximately caused the injuries.

24   State Farm, 142 P.3d at 1239.  While the striking of Mr. Finocchiaro is significant it does not

25   preclude Plaintiff's design defect theory at the summary judgment stage.  In Arizona, two

26   tests may be used in determining whether a product is defectively designed.  First, under the

27   "consumers expectations test," the fact-finder determines whether the product "failed to

28   perform as safely as an ordinary consumer would expect when used in an intended or

- 16 -

reasonable manner." Golonka v. General Motors Corp., 204 Ariz. 575, 581, 65 P.3d 956, 962 (Ariz.App. 2003) (citation omitted).   Moreover, under the risk/benefit analysis, the fact-finder is asked to decide, in light of certain relevant factors, whether "the benefits of [a] challenged design ... outweigh the risk of danger inherent in [the] design." Id.  Such relevant factors to the risk/benefit analysis include: (1) the usefulness and desirability of the product; (2) the availability of other and safer products to meet the same need; (3) the likelihood of injury and its probable seriousness; (4) the obviousness of the danger; (5) common knowledge and normal public expectation of the danger; (6) the avoidability of the injury by care in use of the product (including the effect of instructions or warnings); and (7) the ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive. Id. (citing Dart v. Wiebe Mfg., Inc., 147 Ariz. 242, 245, 709 P.2d 876, 879 (Ariz. 1985)).  Generally, the consumer expectations test has limited utility in the context of a design defect case, thus courts additionally or alternatively employ the risk/benefit analysis to determine whether a product's design is defective or unreasonably dangerous. Id. Based upon the evidence before the Court, it appears that both tests may apply.  See Golonka, 204 Ariz. at 582 (giving jury instruction encompassing consumer expectation and risk/benefits test).   However, even in accepting the Defendants' argument that only the risk/benefits test should be applied, there is still sufficient evidence demonstrating a material of issue of fact regarding Plaintiff's design defect theory.  It is the jury, not the court, that is in the better position to weigh the risk/benefit factors in determining the existence of a design defect.  For example, the jury is in a better position to balance such factors as the utility of the product, the likelihood of injury and its probable seriousness, the obviousness of the danger and the ability of the Defendants to eliminate the danger.  The jury can evaluate these elements based upon the witness testimony and the circumstances surrounding the accident. Plaintiff offers the affidavit of Ian Radcliffe, the manufacturing manager of the Ameron facility, offering his recollection of Mr. Martinez's duties and of the accident including that Mr. Martinez was pulled past the guards into the "trunnion tires by the rotating mixing

drum." (Plaintiff's Response, Dkt.#64, Exhibit 5).[2][3]   The fact that guards were installed to protect against such incidents raises the possibility of a defective design in light of the fact that the guards did not prevent Mr. Martinez from being pulled under the cement mixer.  To the extent the guards collapsed, causing Mr. Martinez to become trapped, it is for the jury to determine whether the guards were improperly designed. See Moorer v. Clayton Mfg. Corp., 128 Ariz. 565, 568, 627 P.2d 716, 719 (Ariz.App. 1981) (finding that whether design defect existed for dynamometer which involved nip-point was issue of fact for jury based, in part, upon pictures of machine and testimony regarding the accident.).  In this case, even without the expert testimony of Mr. Finocchiaro regarding his opinion of a defective design, there is sufficient evidence, when viewed in the light most favorable to the Plaintiff, for the design defect claim to proceed forward.  The circumstances surrounding the accident and witness testimony provide a sufficient basis suggesting that the guards of the cement mixer were not properly designed to protect against the type of injuries sustained.

**B.     Information Defect**

As a preliminary matter regarding Plaintiff's information defect claim, Defendants contend that Plaintiff's failure to specifically allege and identify this claim requires that the Court summarily dismiss such a theory at this late stage of the litigation.  Defendants argue that Plaintiff's complaint asserts only a design defect claim, rather than an information defect claim and that such failure precludes Plaintiff's information defect claim from going forward. Plaintiff, on the other hand, asserts that she was not required to make an election as to which products liability theory to proceed under and that such alternative theories were adequately raised in the Complaint and the Parties' Joint Case Management Plan.  (Dkt.#16, p.4,6).

---

[2]While Mr. Radcliffe may not be qualified to offer any expert opinion on specialized matters such as whether the cement mixer was defectively designed, he is qualified to render lay testimony regarding his observations of the accident.

[3] Other such witness testimony may come from Mr. Jose Luis Urias-Castro, who discovered Mr. Martinez after he became trapped.  (PSOF ¶7).

In reviewing the arguments advanced, the Court finds that the Defendants were adequately informed of Plaintiff's information defect theory.  First, under Rule 8, Fed.R.Civ.P., the Defendants were adequately informed with Plaintiff's Complaint as to the informational defect theory.  The Complaint asserts broad language such as  that the cement "as designed, manufactured, assembled, marketed, distributed, and sold by Defendants was defective and unreasonably dangerous..." (Dkt.#1, Complaint, ¶17).  Moreover, Plaintiff alleges that the cement mixer's  "design and manufacture failed to incorporate safety features to prevent persons working in close proximity to the machinery from being pulled into the machinery itself." (Dkt.#1, Complaint, ¶17(c)).  Such allegations implicate an information defect theory. See Southwest Pet Products, Inc. v. Koch Industries, Inc., 273 F.Supp.2d 1041, 1060 n.28 (D.Ariz. 2003) (plaintiff's information defect theory claim was not defectively alleged where complaint alleged the product at issue, wheat, was "contaminated").  In addition, if any doubt surrounded the Plaintiff's Complaint, such ambiguity was remedied by the Parties' Joint Case Management Plan which unequivocally identifies design and informational defect claims. (Dkt.#17, pp. 4,6).

In addition to contending that Plaintiff's information defect theory should be considered waived, the Defendants contend that any such theory fails on the merits as well.  For instance, Defendants note that Plaintiff's own expert acknowledged at his deposition that he did not believe there to be any defect with respect to the Defendants' owners manual or that it  caused or contributed the accident involving Mr. Martinez.  (Defendants' Motion for Summary Judgment, Dkt.#58, Exhibit 8, p.282, ll.1-6).   Moreover, Defendants cite the warnings and instructions that accompanied the sale of the cement mixer to Ameron in support of their argument that no such information defect existed.  In opposition to Defendants' argument, Plaintiff contends that a fact question remains as to whether Defendants supplied proper information to Ameron with regard to well recognized dangers associated with the product.  Specifically, Plaintiff contends that the Defendants failed to provide any warning or instruction advising Ameron that employees should not be permitted to work in the area of the rotating cement mixer or that the guards on the cement mixer would

1   not provide adequate protection for workers working in close proximity to the mixer while

2   it was rotating. (Plaintiff's Response, Dkt.63, p.11).

3        In Arizona, to make out a prima facie case of strict products liability based upon an

4   information defect, a plaintiff must establish that: (1) the defendant had a duty to warn

5   regarding; (2) the lack of the warning made the product unreasonably dangerous and

6   defective; (3) the lack of sufficient warnings existed when the product left the defendant's

7   control; and (4) the failure to provide an adequate warning proximately caused the injuries.

8   Gosewisch v. American Honda Motor Co., Inc., 153 Ariz. 400, 403, 737 P.2d 376, 379 (Ariz.

9   1987). In reviewing these elements, the Court finds that there is sufficient evidence to

10  support the assertion of an information defect claim beyond summary judgment. For

11  instance, Mr. Martinez, as an employee of Ameron and the cement mixer operator, clearly

12  qualifies as a foreseeable user of the cement mixer, thus implicating the Defendant's

13  obligation to provide adequate warnings and instructions addressing the use of the cement

14  mixer. The Defendants point out that the cement mixer did possess multiple warnings such

15  as directing the operator to shut down, lock-out and tag-out the machine while performing

16  maintenance or lubricating the mixer. (DSOF ¶4). Moreover, Defendants conspicuously

17  instructed to "NEVER ATTEMPT TO CLEAN, OIL, OR ADJUST ANY MACHINE

18  WHILE IT IS IN MOTION." (Emphasis original). (Id. Exhibit 6). There was also a warning

19  stating that failure to conduct such safety procedures could result in death or serious injury.

20  (DSOF ¶5). These warnings clearly warn against such activities as cleaning, oiling,

21  adjusting, or performing maintenance on the cement mixer while operating. However, at the

22  time of the accident, neither party can identify with certainty the type of activity that Mr.

23  Martinez was engaged in. As such, to the extent that Mr. Martinez was performing other

24  activities in close proximity to the operating cement mixer, it raises the possibility that

25  Defendants should have provided a warning against work performed in close proximity to

26  the cement mixer. Moreover, the Court cannot find as a matter of law that the danger

27  associated with such work was so open or obvious to eliminate the Defendant's obligation

28  to Mr. Martinez. As a foreseeable user of the cement mixer, the Defendants owed Plaintiff

1  a duty to provide adequate warnings.  It is for the jury to determine whether the Defendants

2  breached that duty by not warning against work performed in close proximity to the cement

3  mixer while operating and that the guards would not provide adequate protection.

4  Additionally, it is a jury determination as to whether the lack of such warnings proximately

5  caused Mr. Martinez's injuries and death.  See Piper v. Bear Medical Systems, Inc., 180 Ariz.

6  170, 883 P.2d 407 (Ariz.App. 1983) ("[p]roximate causation ... is generally a jury question.").

7  For instance, Defendants argue that in light of Mr. Martinez's routine disregard of the other

8  warnings, such as cleaning the cement mixer while operating, that it is reasonable to assume

9  that Mr. Martinez would have disregarded any other warning, such as performing work in

10  close proximity to the cement mixer.  However, that presumption is a matter for the jury to

11  determine and it would be an improper inference for this Court to make in granting summary

12  judgment on the issue of causation.

13  **VII.        Summary**

14      The Court finds that it is appropriate to strike, in part,  Plaintiff's expert, Mr. Finocchiaro,

15  and his proposed expert testimony regarding the existence of a design or information defect

16  regarding Defendants' cement mixer.  Mr. Finocchiaro's expert testimony on these issues is

17  not reliable when evaluated in the context of a Daubert analysis and Rule 702 Fed.R.Evid

18  and  runs afoul of Rule 403 Fed.R.Evid.  However, even without certain expert testimony

19  from Mr. Finocchiaro, the Court finds that summary judgment is not warranted regarding

20  Plaintiff's design and information defect theories.  Such theories are supported by the

21  circumstances surrounding the accident and the witness testimony.

22      **Accordingly,**

23      **IT IS HEREBY ORDERED** granting in part and denying in part, Defendants' Motion

24  to Strike the Testimony of Plaintiff's Expert, Carl Finocchiaro.  (Dkt.#53)

25      **IT IS FURTHER ORDERED** denying Defendants' Motion for Summary Judgment.

26  (Dkt.#57).

27  ///

28  ///

1     **IT IS FURTHER ORDERED** setting this matter for a status hearing on April 23, 2007,

2 at 4:00 p.m.

3

4     DATED this 26th day of March, 2007.

5

6

7                                         Mary H. Murguia
                                          United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28